UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
MICHAEL COHEN,

                Plaintiff,

          -against-                    **COMPLAINT**

BEAN LLC, d/b/a FUSION GPS, and
GLENN SIMPSON,                  Case No.: _____

                Defendants.
------------------------------------------------------------------------

      Plaintiff, MICHAEL COHEN (hereinafter "Plaintiff"), by and through his attorneys, Gerstman Schwartz and Malito, LLP, complaining of the Defendants BEAN LLC, d/b/a FUSION GPS, and GLENN SIMPSON (hereinafter "Defendants"), sets forth and alleges as follows:

<u>**PRELIMINARY STATEMENT**</u>

      1.     This action arises from the immensely damaging and defamatory statements made by Defendants against Plaintiff through widely disseminated political opposition reports commissioned by opponents of presidential candidate Donald Trump.  Defendants, a D.C.-based political opposition research firm and its principal, Glenn Simpson, published these reports, which came to be known as the "Dossier," in advance of the 2016 U.S. presidential election (annexed hereto as "**Exhibit A**").

      2.     The reports stated that Plaintiff met with representatives of the Russian government in Prague, Czech Republic, in August of 2016 in order to (1) "clean up" the mess left by other representatives of candidate Trump; (2) figure out how to pay off the hackers who had been allegedly paid by the Trump campaign and the Russian government to undermine presidential candidate Hillary Clinton's presidential campaign; and (3) ensure that the hacking operation continued and cover it up from later discovery, if necessary. <u>See</u> <u>Exhibit A</u>.  But Plaintiff did not

commit any of the acts irresponsibly attributed to him by Defendants.  To the contrary, Plaintiff is collateral damage in a U.S. political operation – conducted by Defendants – that has nothing to do with Plaintiff.

3.      Specifically, the reports that include defamatory statements concerning Plaintiff are four of seventeen written Company Intelligence Reports 2016 ("CIRs") that comprise the Dossier. These reports purport to describe details of an alleged scheme between the Russian government and the Trump campaign to unlawfully manipulate the result of the presidential election in favor of candidate Trump.  Defendants gathered these reports in the process of conducting "opposition research" against candidate Trump.[1]

4.      As described below, Defendants were initially hired to conduct this opposition research by Republican Party political opponents of candidate Trump.  Those political opponents sought to gather discrediting information about candidate Trump to thwart his presidential run, including any connections he might have to Russian businesses or Russia's government.  To perform that research, Defendants hired a private investigator—a former British intelligence officer named Christopher Steele, who operated through an entity known as Orbis Business Intelligence Limited ("Orbis").  Steele used his own Russian sources to compile the reports, which were then delivered to Defendants over the course of several months.  Eventually, the reports, including the false and defamatory reports at the heart of this case, were assembled in the document that has come to be known as the Dossier.  Even though the Dossier contained unverified allegations, Defendants recklessly placed it beyond their control and allowed it to fall into the hands of media devoted to breaking news on the hottest subject of the day: the Trump candidacy.

---

[1] Opposition research is the jaundiced gathering of information for the purpose of eventually discrediting or otherwise harming a candidate for a public office.

5.      Four of the seventeen reports in the Dossier, CIRs 134-136 & 166, accused Plaintiff of criminal conduct and participation in an alleged Trump-Russia scheme to influence the 2016 presidential election.   Defendants knew that these reports were not verified, and that they defamed Plaintiff on their face.   Defendants could easily have removed the reports from the Dossier before they started peddling the Dossier to media and journalists in September and October 2016.   They chose not to do so.   Nor did they attempt to determine the veracity of these reports with Plaintiff himself.

6.      On information and belief, Defendants arranged for Steele to brief selected members of the print and online media about the information he was compiling on candidate Trump.   Consistent with the intended purpose of "oppo research" to publicly discredit its target, Steele's briefings were designed to generate interest in the Dossier and secure its eventual public dissemination.   Briefings were held for journalists from the New York Times, the Washington Post, CNN, Yahoo News, and others in September 2016.   Shortly thereafter, Yahoo News published an article by Michael Isikoff that described some of the content of the Dossier (referred to there as "intelligence reports" and "reports"), which were still being compiled at that time. Many other media articles reported speculative accounts of the Dossier's existence and contents. In October 2016, Steele was interviewed by David Corn, a writer for Mother Jones, which on October 31, 2016, published an article headlined "A Veteran Spy Has Given The FBI Information Alleging a Russian Operation to Cultivate Donald Trump."   The Corn article stated that it had "reviewed" the early reports in the Dossier, and then quoted from those reports as well as statements made by Steele in the interview.   The public dissemination of the Dossier's content had begun in earnest.

7.     In addition to cultivating media interest, Defendants also organized or approved a meeting in Great Britain between Steele and David Kramer, a director of a private foundation led by U.S. Senator John McCain.  The purpose of that meeting was to brief Kramer on behalf of Senator McCain, who at the time was an outspoken critic of Trump's candidacy.  Subsequently, in November 2016, Defendants provided a copy of the Dossier's first sixteen reports, including at least one of the reports that falsely accused and defamed Plaintiff, to Kramer for redelivery to Senator McCain.

8.     As the 2016 presidential election neared, both print and online media in the United States and, on information and belief, abroad, began to expand their coverage of the Dossier and its alleged content.  That coverage only intensified after Trump won the election.  On January 10, 2017, one of those media entities, BuzzFeed, Inc., published the entire Dossier on the Internet, describing it as "explosive."  The copy of the Dossier that BuzzFeed published included the false and defamatory allegations about Plaintiff, along with an article entitled, "These Reports Allege Trump Has Deep Ties to Russia" (annexed hereto as "**Exhibit B**").  In a recent court filing, Fusion admitted that it had "pre-publication" communications with BuzzFeed about its publication.

9.     Plaintiff seeks an award of compensatory and punitive damages for the harm to his personal and professional reputation, current business interests, and the impairment of business opportunities that resulted from the blatantly false and defamatory statements and implications about him published by Defendants.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction, pursuant to 28 U.S.C. § 1332(a)(1) over all claims alleged herein as the matter in controversy in the cause of action asserted herein is between citizens of different States and exceeds $75,000 in damages.

11.     Venue properly lies in this Court because and it is a judicial district within a state that all Defendants are residents of and because it is a judicial district in which the events and omissions giving rise to the claims alleged herein occurred.

### PARTIES

12.     Plaintiff Michael Cohen is an attorney for Donald Trump and resident of New York, New York.

13.     On information and belief, Defendant Bean LLC is a Delaware corporation that conducts business under the name Fusion GPS.  Fusion is registered to transact business in Washington, D.C., where it is headquartered and conducts its operations.

14.     Defendant Glenn Simpson, on information and belief, is a principal of Fusion.  On information and belief, he was the principal actor involved in securing the Dossier from Orbis and Steele, arranging for press briefings about it in the late summer and early fall of 2016, and publishing the Dossier to Fusion's clients, government officials, and the news media.  On information and belief, Simpson conducts his business for Fusion from an office in Washington, D.C., where his business included his activities with respect to the Dossier.  Both Simpson and his sub-contractor Steele used their prior experience as, respectively, an investigative journalist for the Wall Street Journal and an operative in British intelligence covering Russian matters, to give their "oppo research" output a gloss of credibility and reliability which, in this case, was unwarranted.  Neither of them has ever stated that the Dossier and CIRs 134-136 & 166 were compiled in a fashion that accords with standards observed in their professions for establishing the credibility of sources and for verifying information provided by the sources.  To the contrary, Steele has stated publicly that he did not abide by such standards in compiling the Dossier.

## **FACTUAL ALLEGATIONS**

15.     Defendants were engaged by Republican Party political opponents of candidate Trump prior to his nomination as the Republican presidential candidate.  Defendants were tasked with conducting "oppo research" against candidate Trump, including the gathering of compromising and salacious information about candidate Trump's personal behavior and business dealings in Russia.  Defendants in turn engaged Orbis and Steele for assistance in completing this task.

16.     Orbis proceeded to research candidate Trump's personal behavior in Russia and business dealings with Russian government officials, business leaders, and business entities. Steele compiled the "investigative" results into at least seventeen written CIRs for delivery to Defendants in Washington, D.C.  The CIRs included raw, unverified information.

17.     After candidate Trump received the Republican nomination for President in July 2016, Defendants' Republican clients terminated their relationship with Fusion.  Media reports subsequently surfaced asserting that Fusion had entered into a new engagement with Democratic Party operatives interested in using the oppo research to support Hillary Clinton's candidacy.

18.     During this campaign to promote the public dissemination of their "oppo research," which, upon information and belief, included the provision of background briefing to the media by Defendants without attribution, Defendants never vouched for the credibility of their sources or the accuracy and reliability of the content of the Dossier and CIRs 134-136 & 166.  Defendants published the Dossier and CIRs despite the fact that they did not know whether the defamatory accusations in CIRs 134-136 & 166 about Plaintiff were true.

19.     CIR 134, dated October 20, 2016, is the first report to discuss Plaintiff in defamatory fashion.  In the "Summary" section of this report, it states: "Kremlin insider highlights

importance of TRUMP's lawyer, Michael COHEN in covert relationship with Russia.  COHEN's wife is of Russian descent and her father a leading property developer in Moscow."  Further down, in the "Detail" section, the report again states that Plaintiff played a "key role in the secret TRUMP campaign/Kremlin relationship."  See Exhibit A.

20.     Under this report, Plaintiff is alleged to have an inappropriate and possibly criminal relationship with the Russian government stemming from his wife's familial relations with a Russian property developer.  None of these allegations are true.  Plaintiff does not have any relationship with Russian officials and his father-in-law is not a leading property developer in Moscow; he has only been to Russia once.  In fact, Plaintiff's father-in-law does not even own a vacation home in Sochi, nor has he ever been there.  Additionally, Plaintiff's wife was born in the Ukraine region and immigrated to the United States over forty (40) years ago; she has never been to Russia.  And the harm caused by the allegations is obvious: Plaintiff is being accused of maintaining a valuable role in candidate Trump's allegedly unlawful relationship with Russia and, in the context of the rest of the Dossier, the report implies that Plaintiff was vital in the unlawful manipulation of the 2016 U.S. presidential election.  This has also harmed Plaintiff's reputation in his profession as an attorney-at-law.

21.     CIR 135, dated October 19, 2016, is similarly defamatory, beginning with the title, "RUSSIA/US PRESIDENTIAL ELECTION: THE IMPORTANT ROLE OF TRUMP LAWYER, COHEN IN CAMPAIGN'S SECRET LIAISON WITH THE KREMLIN."  In the "Summary" section, it states that Plaintiff "engaged with Russians in trying to cover up scandal of MANAFORT and exposure of PAGE and meets Kremlin officials secretly in EU in August in pursuit of this goal."  The "Detail" section explains this allegation further, first stating that Plaintiff was important in "the ongoing secret liaison relationship between the New York tycoon's

[Trump's] campaign and the Russian leadership," which grew following Mr. Manafort's departure as candidate Trump's campaign manager in August 2016, then states that Plaintiff became "heavily engaged in a cover up and damage limitation operation in the attempt to prevent the full details of TRUMP's relationship with Russia being exposed." See Exhibit A.

22.     The report goes on to describe how Plaintiff's role in attempting a cover-up, finding that Plaintiff "met secretly with several Russian Presidential Administration (PA) Legal Department officials in an EU country in August 2016" in order to find ways to contain Mr. Manafort's connections to Russia and Ukraine and Mr. Page's secret meetings with Russian leadership figures in Moscow, with "the overall objective" being "'to sweep it all under the carpet and make sure no connections could be fully established or proven." See Exhibit A.

23.     Finally, the report states that because the relationship between candidate Trump and Russia had become "'hotter'" since August 2016, the Russian government used individuals from pro-government policy institutes for communications with the Trump campaign, while Plaintiff "continued to lead for the TRUMP team." See Exhibit A.

24.     Neither of these allegations are true as Plaintiff never met with Russian officials for the purpose of discussing former Trump campaign officials.  Indeed, the salacious report even admits that the insider who provided this information was "unsure of the identities of the PA officials with whom COHEN met secretly in August, or the exact date/s and locations of the meeting/s."  Clearly, this report was generated with the knowledge that it was false and/or with a reckless disregard as to whether any of it contained a modicum of truth.  The harm caused by these fallacious allegations is also clear: Plaintiff is once again linked to the unlawful election rigging conspiracy through baseless accusations, but this time through the implication that he was aware of the acts of two Trump campaign officials who have been themselves linked to this conspiracy

and personally sought to conceal their illicit acts, and has been damaged in his profession. <u>See</u> <u>Exhibit A</u>.

25.     CIR 136, dated October 20, 2016, followed-up on the previous report as to Plaintiff's alleged meetings with Russian officials in August of 2016 by finding that a "Kremlin insider" indicated to the source that Plaintiff's "reported contact/s took place in Prague, Czech Republic."  In the "Summary" section, CIR 136 also states that Konstantin Kosachev, the Head of the Foreign Relations Committee for Russia and a "Pro-Putin leading Duma figure," was involved as a "'plausibly deniable' facilitator" who "may have participated in the August meeting/s with COHEN."   In the "Detail" section, it is claimed that a Russian parastatal organization, "Rossotrudnichestvo," was "being used as a cover" for the relationship between the Trump campaign and Kremlin officials that these meetings between Plaintiff and Russian officials may have occurred in this organization's Prague office in order to protect the Russian government from suspicion. <u>See</u> <u>Exhibit A</u>.

26.     None of these allegations are true.  Plaintiff has never even been to Prague, Czech Republic, let alone in August of 2016, and therefore could not have met with Mr. Kosachev, nor could he have met with Kremlin officials in a Russian parastatal organization's office.  These muckraking statements are thus without any basis in truth and have only served to harm Plaintiff's reputation as an attorney and have damaged Plaintiff by linking him to the Trump campaign's alleged unlawful acts of meddling with the presidential election.

27.     CIR 166, dated December 13, 2016, followed up from CIRs 135 & 136 by first stating that Plaintiff was accompanied to the meeting(s) by three colleagues and changes when they took place from August of 2016 to "either in the last week of August or the first week of September."  Additionally, the report describes the topic of the Prague meeting(s), finding:

> the agenda comprised [of] questions on how deniable cash payments
> were to be made to hackers who had worked in Europe under
> Kremlin direction against the CLINTON campaign and various
> contingencies for covering up these operations and Moscow's secret
> liaison with the TRUMP team more generally.

Further, Plaintiff is accused of having agreed to "contingency plans for various scenarios to protect the [hacking] operation, but in particular what was to be done in the event that Hillary CLINTON won the presidency." Namely, the alleged plan was to ensure that "all cash payments owed [to hackers] were made quickly and discreetly and that cyber and other operators were stood down/able to go effectively to ground to cover their traces." See Exhibit A.

28.     Through their publishing of CIR 166, Defendants accused Plaintiff of not only meeting with Russian officials, but of knowing about the alleged illegal hacking and formulating plans on how to ensure that this operation could continue and would not be later uncovered. The report also implicates Plaintiff in the hacking of the U.S. election by finding that he helped determine how to recompense the hackers responsible. As aforementioned, Plaintiff has never even been to Prague, Czech Republic, and therefore none of the accusations are true in the slightest. And the damage caused by these false allegations was indescribably destructive and irreversible. The report describes Plaintiff as overseeing a significant part of an illegal operation that permanently altered global politics which, to put it lightly, severely harmed his personal, professional, and institutional reputation.

29.     By cause of Defendants' publication of the Dossier, which they knew to be false and/or published with a reckless disregard of whether it was actually true, Plaintiff sustained significant financial and reputational damages. In particular, by publishing the fallacious reports concerning Plaintiff, Plaintiff was subjected to at least two separate Congressional investigations

by the House Permanent Select Committee on Intelligence (annexed hereto as "**Exhibit C**") and

the Senate Select Committee on Intelligence (annexed hereto as "**Exhibit D**").

## CAUSE OF ACTION

Intentional Tort – Defamation Per Se
(As against both Defendants)

30.      Plaintiff repeats, reiterates, and re-alleges each and every allegation above as

though set forth herein.

31.      In order to state a cause of action for defamation, a plaintiff must allege the making

of a false statement which was published to a third party, and resulting damages.  When the

plaintiff is a public figure, he must also allege that the defamatory statement was made with actual

malice, meaning that the party who published the statement knew it was false or acted with reckless

disregard to its truth or falsity.

32.      Further, a cause of action for defamation per se is stated when the false statements

utterly injure a plaintiff in his trade, business, or profession or accuse him of committing a serious

crime.

33.      Through their direct and intentional publication to third parties such as clients, news

media, journalists, and others, Defendants published false and defamatory statements concerning

Plaintiff.

34.      Namely, Defendants published statements accusing Plaintiff of playing a key role

in the conspiracy formed by candidate Donald Trump's presidential campaign team and the

Russian government to rig the 2016 U.S. presidential election through meeting with Kremlin

officials in Prague, Czech Republic, in August and/or September 2016 to decide: (1) how to cover-

up the crimes committed by Paul Manafort and Carter Page; (2) how to pay off the hackers who

had been paid by the Trump campaign and the Russian government to undermine candidate Hillary

Clinton's presidential campaign; and (3) how to ensure that the hacking operation continued and cover it up from later discovery, if necessary.

35.     Defendants knew that the Dossier reports were false and/or acted with reckless disregard in determining whether the reports were true or false.

36.     By reason of the foregoing acts of Defendants, Plaintiff sustained, and will continue to sustain, serious financial and reputational damages, in particular to his profession as an attorney and due to the serious crimes he has been accused of committing.

## JURY DEMAND

Plaintiff hereby demands a trial by jury as to all issues so triable.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, upon all of the facts and circumstances herein alleged, Plaintiff respectfully requests that this Court:

A.   Grant judgment against Defendants on each and every cause of action alleged herein;

B.   Grant an order awarding Plaintiff damages in an amount to be determined at trial, together with interest and the costs and disbursements of this action, plus reasonable attorneys' fees, punitive damages, as well as any other damages permitted to be recovered by law pursuant to the above causes of action; and

C.   Grant any such further relief as the Court deems just, proper, and equitable.

Dated: January 9, 2018
       Garden City, New York

                                    GERSTMAN SCHWARTZ & MALITO, LLP

                                           /s/ David M. Schwartz
                                    By: _____
                                        David M. Schwartz, Esq. (DS 9776)
                                        1399 Franklin Avenue, Suite 200
                                        Garden City, New York 11530
                                        Tel. No.: (516) 880 – 8170
                                        dshwartz@gerstmanschwartz.com